# In the United States Court of Federal Claims

### No. 15-370C
### (Bid Protest)
### (Filed: April 28, 2017)[1]

* * * * * * * * * * * * * * * * * * * * * * * *

| | |
|---|---|
| **OPEN SPIRIT, LLC,** | Bid Protest; Out-Grant Lease; |
| | Cancellation of Request for Proposals; |
| **Plaintiff,** | 28 U.S.C. § 1491(b)(1); 5 U.S.C. § 706; |
| | 10 U.S.C. § 2667; 41 U.S.C. § 111; Bad |
| **v.** | Faith. |
| **THE UNITED STATES,** | |
| **Defendant.** | |

* * * * * * * * * * * * * * * * * * * * * * * *

    <u>Jorge I. Hernandez</u>, Law Offices of Jorge I. Hernandez, 823 Anchorage Place, Chula Vista, CA 91914, for Plaintiff.

    <u>Benjamin C. Mizer</u>, <u>Robert E. Kirschman, Jr.</u>, <u>Steven J. Gillingham</u>, and <u>Douglas T. Hoffman</u>, United States Department of Justice, Civil Division, Commercial Litigation Branch, PO Box 480, Ben Franklin Station, Washington, D.C., 20044, for Defendant.

---

### OPINION AND ORDER

---

[1]    The Court issued this Opinion and Order under seal on March 30, 2017.  As Plaintiff's counsel is also one of three members of Open Spirit, LLC, the Court denied him access to Protected Information. Tr. 16 (May 6, 2015).  The Court directed Defendant to file any proposed redactions to this Opinion by April 12, 2017.  After Defendant filed its proposed redactions, the Court ordered Plaintiff to review Defendant's proposed public opinion and propose its own redactions. Order (Apr. 19, 2017).  On April 27, 2017, Plaintiff notified the Court that it had no further redactions.  Pl.'s Notice 1. The Court publishes this Opinion and Order correcting errata and indicating redactions by asterisks "[***]."

Plaintiff Open Spirit, LLC ("Open Spirit") protests the Navy's cancellation of a solicitation for an out-grant lease ("Lease") at the Navy Base Point Loma in San Diego, California.[2]  Plaintiff raises two protest grounds arguing that the Navy 1) unreasonably canceled the solicitation and 2) acted in bad faith by discriminating against small businesses and conducting ex parte communications with the incumbent occupant, Lockheed Martin Corporation ("Lockheed Martin").

Because the Navy had a rational basis for cancelling the solicitation and Plaintiff failed to demonstrate that the Navy acted in bad faith, Defendant's motion for judgment on the Administrative Record is granted.

## **Findings of Fact**[3]

## **Lockheed Martin's Prior Licenses and the Navy's Decision to Compete the Lease**

The disputed Lease property is controlled by the Navy and located in the Old Town 3 Building ("OT3") of Navy Base Point Loma.  Prior to 1993, this building had been under the custody of the United States Air Force, and Lockheed Martin's predecessor, Martin Marietta Technologies ("Martin"), occupied 400,000 square feet "in connection with development of the Atlas/Centaur launch vehicles."  AR 163, 2765.  In July 1993, the Navy's Base Realignment and Closure Commission recommended that the Navy begin using OT3 space as the "receiving location of the Naval Electronic Systems Engineering Center."  AR 2765.

To facilitate both the Navy's and the Air Force's needs, the Navy entered into its first lease agreement with Martin in 1994, to permit Martin's continued work on the Air Force's launch vehicles through United Launch Alliance ("ULA").  AR 163, 2765-66.  This lease continued through September 2005.  AR 10, 165.  In April 2005, the Navy sought approval for a second long-term lease to ULA, as ULA was continuing its work on the Air Force's Atlas/Centaur launch vehicles.  AR 2775-76.  The Under Secretary of the Navy approved a second five-year lease to ULA.  AR 10, 165, 2766.

ULA entered into another five-year lease with the Navy starting on November 1, 2010.  AR 10.  ULA assigned the lease to Lockheed Martin in January 2012, and Lockheed downsized the Lease premises from 400,000 to the approximately 100,000 square feet at issue.  AR 10, 165-66.

---

[2]    An "out-grant" lease is an instrument by which the Federal Government leases Government-owned real property to a nongovernment party.  The Lease at issue covered approximately 100,000 square feet.

[3]    These findings of fact are derived from the Administrative Record ("AR").  The Court has not corrected grammatical errors in quotations from the AR and the filings.  Additional findings of fact are in the Discussion.

Lockheed's lease was subsequently extended in three-month increments through April 30, 2013, via contract amendments. AR 165, 2768, 2825.[4]

In 2013, prior to the end of Lockheed's second lease extension, the Navy conducted a "command inquiry" of the real estate department which uncovered "issues . . . regarding the OT3 lease." AR 2480-81. While the results of this inquiry are not in the record, David Bixler, the Contracting Officer overseeing the instant Lease competition, testified that the Navy determined that this Lease had "not been advertised as often as it should have been," and that the Navy did not make the results of this inquiry public. AR 2481. Contracting Officer Bixler testified that he "took over" the real estate department following the inquiry because his predecessor had been asked to retire early. AR 2478-80.

Although departments of the military seeking to lease Government-owned property exceeding $100,000 in fair market value are required to use competitive procedures to select the lessee, the Secretary of the given military department has discretion to determine whether it is in the public interest to compete such a lease. See 10 U.S.C. § 2667(h)(2)-(4) (2012) (providing exceptions to using "competitive procedures" for leasing government-owned property including "if the Secretary concerned determines that (A) a public interest will be served as a result of the lease; and (B) the use of competitive procedures for the selection of certain lessees is unobtainable or not compatible with the public benefit served under subparagraph (A).").

Here, Lockheed Martin had been awarded its prior leases without competition based on its work for the Air Force on "Production and Research and Development of Atlas, Centaur launch vehicles and related components." AR 2779. However, Contracting Officer Bixler testified that, in his view, the Lease premises in OT3 "should have always been competed" and that following the command inquiry, the real estate department was "changing . . . how [it was] doing licenses and leases." AR 2482, 2498.

Where the Government chooses to competitively lease its property and annual rental value exceeds $750,000, the Secretary of that military department must submit a report to the Committees on Armed Services of the Senate and the House of Representatives. 10 U.S.C. § 2662(a)(1)(C), (b) (2013). On January 31, 2014, the Navy submitted its report to Congress on its proposal to competitively lease up to 100,000 square feet of underutilized space at Naval Base Point Loma. AR 2887-95. Following submission of the Congressional Report, Contracting Officer Bixler asked his most experienced senior realty specialist, Jennifer Arbesu, to put together the Request for Proposals ("RFP") and conduct the advertisement. AR 2086, 2484-85. Ms. Arbesu drafted the Lease in its entirety. AR 2107. Contracting Officer Bixler reviewed the RFP and Lease prior to advertisement. AR 2495.

As the Navy undertook efforts to compete the Lease, it entered into two one-year licenses with Lockheed Martin, permitting Lockheed to occupy and use the Lease premises before and while the Lease competition was conducted. The first license was in effect from May 1, 2013, through April 30, 2014, and the second, from May 1, 2014, through April 30, 2015. AR 2826,

---

[4]     This lease was to continue until October 31, 2015. The record does not reflect why this lease was terminated on April 30, 2013. AR 10.

3031.  This second license to Lockheed Martin - - set to terminate on April 30, 2015 - - overlapped with the competing of the new Lease, as the RFP specified a Lease start date of January 1, 2015. Compare AR 3031 with AR 219.  However, the Lockheed Martin license was revocable at will by the Navy subject to the following 180-day notice requirement:

> The LICENSEE shall have one hundred eighty (180) days to vacate the Licensed Property from the date LICENSOR provides LICENSEE with written notice to terminate during which time LICENSEE can continue to operate on the Licensed Property.

AR 843.

## The Request for Proposals

On May 13, 2014, the Navy issued RFP No. N6247314RP007 for an out-grant lease of a portion of the southern side of the OT3 building on the Naval Base Point Loma.  AR 215 ("RFP" or "Solicitation").  The award process was to be conducted in accordance with 10 U.S.C. § 2667 which mandated "competitive procedures."  AR 220.  Award was to be made on a technically-acceptable highest price basis.  Id.

The Lease premises consisted of 99,531 square feet - - approximately 89,307 square feet of ground level space and 10,224 square feet of second level space along with 34 parking spaces. AR 219, 572.  Use of the Lease premises was to be "restricted to light industrial and/or dry laboratory with associated administrative space and for no other purpose." AR 219, 572.  The RFP defined "dry laboratory" work to include computer modeling, testing and training that could require accurate temperature and humidity control, dust control, and clean power.  AR 219.  Use for administrative space was limited to 20% of the total square footage.  AR 220.  The initial term of the lease was five years, from January 1, 2015 – December 31, 2019, with a possible extension for one additional five-year term.  AR 219.

Offerors were to submit proposals by June 12, 2014, at 3:00 p.m. Pacific Daylight Time. AR 215.  The RFP contemplated that award would be made within 90 days:

> All offers received shall be deemed valid continuing offers from the date and time of receipt of offers until award by the Government, provided such award takes place within ninety (90) days of the Offer Due Date.

AR 221.  As such, the RFP anticipated that an award would be made by September 9, 2014.  Id.

In case of cancellation, the RFP contained a "No Obligation" clause stating:

> While the Government intends to enter into an agreement with an Offeror selected through this RFP process, it is under no obligation to do so.  The Government reserves the right to cancel this RFP, or to reject any and all submissions prepared in response hereto.  The Government is not responsible for any costs incurred in order to participate in this RFP process, including any "bid and proposal" costs. The Lease will not obligate any appropriated funds.

4

AR 226.

Offers were to be evaluated according to three factors - - Past Performance, Use of Property, and Rent Price.  AR 224.  Past performance was to be ranked on an acceptable, unacceptable, or neutral basis.  Id.  Use of property was to be ranked on an acceptable or unacceptable basis.  AR 224-25.  Rent price proposals were to be:

> evaluated to determine the reasonableness of the Offeror's proposed annual rent price offer of the Leased Premises; however, only offers that are equal to or greater than the Fair Market Value, as discussed in 5.9 below,[5] will be considered.  A proposal that fails to offer an annual rent price that is equal to or greater than the Fair Market Value will be evaluated as unacceptable.

AR 225.

### Performance Bond and Rent-Splitting Terms in the Lease

The RFP included a copy of the Lease to be executed between the Navy and the awardee.  AR 229-312.  Paragraphs 4.1 through 4.1.2 of the Lease required offerors to submit a performance bond and security deposit of $750,000:

> 4.1. To secure the faithful performance of its rent and other obligations, hereunder, LESSEE shall provide the Government with a security deposit in the fixed amount of $750,000.  If the Government shall at any time determine that the increase in the amount of security is necessary to make same commensurate with LESSEE's obligations hereunder, LESSEE shall furnish such additional security promptly upon request.  The Security Deposit provided shall be in the form of either:

> 4.1.1 Performance Bond issued by a Corporate Surety and satisfactory to the Government in all respects.

> 4.1.2 Standby Letter of Credit renewable annually in a form satisfactory to the Government in all respects.

AR 237.

---

[5]     The reference to 5.9 appears to be a typographical error as section 5.9 of the RFP discusses the RAPIDGate program used to facilitate access by non-military personnel to Naval Base Point Loma.  AR 225, 227.  The RFP stated in section 5.10 that the appraisal would meet "Federal Appraisal Standards."  AR 227.

On August 28, 2013 - - eight months before the RFP was issued - - the Lease premises were appraised at $720,000 to $780,000, based on a pricing range of 60 to 65 cents per square foot.  AR 85.  This appraisal was not shared with offerors.  The RFP stated that the appraisal was for the sole use of the Government and was not available to prospective offerors.  AR 227.  Although Lockheed Martin knew the rental rates it was paying for the property, there is no evidence that the Government provided Lockheed with the appraisal reports.

Section 6 of the Lease provided for subleasing, subject to the prior written consent of the Government.  AR 239.  The Lease permitted the Government to recapture 50 percent of the sublease rental profits to the extent that the sublease rental exceeded the Lease rental:

> 6.4 In the event that LESSEE requests to sublease, license, or grant an interest in the Lease, and the Government approves such an action, if the contract rent/value for the sublease, license, or other grant of interest is greater than the contract rent value of the lease, then the Government shall be entitled to recapture fifty percent (50%) of the difference in rent/value and this fifty percent (50%) difference shall be additional Rent under the terms of this Lease.

Id.

**Environmental Condition of the OT3 Building**

In an attachment to the RFP, the Navy included an Environmental Condition of Property Report ("ECP") that was completed in September 2013, and a February 3, 2014 Memorandum updating the ECP.  AR 268-69, 278-332.  Allison J. Cantu, the Remedial Project Manager for the Navy's Facilities Engineering Command Southwest prepared both reports.  AR 269, 309.  The ECP stated that trichloroethene ("TCE"), a volatile organic compound ("VOC"), had migrated into the OT3 building - - a process called vapor intrusion - - and that the indoor air of OT3 had been sampled for VOCs on several occasions.  AR 295.  TCE is a known "carcinogen and a reproductive hazard," capable of causing dizziness, intoxication, weakness, loss of feeling or coordination, vomiting, unconsciousness, abnormal heart rhythms, cancer, damage to the kidneys and liver, damage to the immune, nervous, and reproductive systems, and fetal cardiac malformations.  AR 308, 852.

The RFP provided:

> 5.7 ENVIRONMENTAL CONDITION OF PROPERTY
> The Navy has prepared an Environmental Condition of Property Report, "*Environmental Condition of Property ("ECP") for Building OT3 Competitive Lease Space and Naval Warfare Systems Command ("SPAWAR"), Old Town Campus ("OTC"), Naval Base Point Loma, San Diego, California,*" dated September 2013, and *Memorandum for the Record ("Memorandum") update to the ECP* dated 3 February 2014.  The ECP and Memorandum set forth the existing environmental conditions of the Leased Premises as represented by a survey conducted by Government and sets forth the basis for the Government's determination that the Leased Premises are suitable for leasing.  With this notice, Offerors are made aware of the notifications contained in the ECP and the Memorandum.  The ECP and Memorandum, included as Attachment "C" of the Lease, may be updated by the Navy prior to Lease execution.  Lessee shall be required to comply with all restrictions identified in the ECP, as well as those in Paragraphs 8.1 through 8.2.3 of the Lease.

AR 226 (italics in original).  The referenced ECP only pertained to the OT3 building and identified the primary area of concern to be on the north side of the OT3 building - - not the south side where the Lease premises are located.  AR 295, 321.  The source of the vapor intrusion was "the release of metal cleaning solvent related to historical aircraft fabrication activities" that "created a plume that has impacted soil gas and groundwater" in the area of the OT3 building.  AR 295.

Like the RFP, Paragraphs 8.1 through 8.2.3 of the Lease outlined various environmental conditions of the OT3 building - - such as lead-based paint issues.  AR 240-41.  Relevant to the instant protest is Subsection 8.2 on "Vapor Intrusion" involving VOCs, specifically TCE, potentially contaminating the air of the OT3 building.  AR 241.

Section 8.2.2 of the Lease provided:

8.2.2. The LESSEE is on notice that test results of the building's indoor air have revealed low concentrations of VOC contaminants, including trichloroethene ("TCE") in the indoor air.  This is detailed in this ECP report, as are risk calculations based on United States Environmental Protection Agency ("EPA") guidance.  These calculations show a cancer and non-cancer health risk for commercial and industrial workers in the range that the LESSEE is required to manage. Management measures include, but are not limited to, measures to enhance ventilation of indoor air to reduce contaminant concentrations.  LESSEE also is required to monitor air contaminant concentrations over time to ensure that contaminant concentrations are kept below EPA and [Occupational Safety and Health Administration] guidelines.  This would necessitate the use of sampling protocols with the ability to detect chemicals at the lower EPA levels.  The monitoring program should include contingency measures to be taken if VOCs exceed certain concentrations.

AR 241.

The Lease also contained a provision which required the Lessee to comply with all applicable environmental laws:

14.1 Compliance with Law.  LESSEE and its officers, employees, agents, contractors, subcontractors, and SubLessees shall comply at its sole cost and expense, with the Federal, state, and local laws, regulations, and standards that are or may become applicable to LESSEE's activities on the Leased Premises.  The intent of this paragraph 14 is to allocate responsibility for compliance with and cost of any kind of authority that could apply to the Government or the LESSEE as a result of LESSEE's use and occupancy of the premises to the LESSEE.  That responsibility is entirely allocated to the LESSEE.  The Government is not responsible for costs arising from LESSEE's use and occupancy of the premises.

AR 243.

The ECP further stated that the levels of TCE in the OT3 building "exceeded its U.S. EPA residential screening levels of 0.43 [micrograms per cubic meter] for cancer risk and 2.1 [micrograms per cubic meter] for non-cancer risk."  AR 297.  These levels did not exceed commercial use/occupational limits.  AR 295.

Table 4 of the ECP listed the results of air sampling taken in June 2011, at various locations in the OT3 building on both the south side - - the Lease premises - - and the north side.  AR 297-98, 325.  Table 4 reported the following concentrations of TCE:[6]

| Location ID | TCE ($\mu g/m^3$) | Location Description |
|---|---|---|
| Building 3 subfloor utility vault | | |
| AIR01 | 210 | Utility Vault #1 (north) |
| AIR02 | 66 | Utility Vault #2 |
| AIR03 | 9.7 | Utility Vault #3 |
| AIR04 | 6 | Utility Vault #4 |
| AIR05 | 93 | Utility Vault #5 (south) |
| Building 3 and Annex | | |
| AIR06 | 5.2 | Annex, northwall, stockroom |
| AIR07 | 4.1 | Annex, southwall, near subgrade utility corridor |
| AIR08 | 2.8 | Annex, enclosed office |
| AIR09 | 1.4 | Annex, x-ray development room/office |
| AIR09 | 1.4 | Annex, x-ray development room/office |
| AIR10 | 0.6 | Assembly area (open area) |
| AIR11 | 0.54 | Open work area |
| AIR12 | 0.39 | Enclosed office/storage |
| AIR12 | 0.39 | Enclosed office/storage |
| AIR 13 | 2.3 | Enclosed office |
| AIR14 | 9.9 | Enclosed office |
| AIR15 | 1.4 | Enclosed office |

AR 298.

Figure 6 depicts the locations of air samples in the OT3 building that resulted in Table 4:

---

[6]     Table 4 included data for other types of volatile organic chemicals, such as tetrachloroethene, that have been removed from the above chart for clarity.  See AR 298.

Samples AIR09 and AIR12 were performed twice.  Id.

8



AR 325.

The ECP attached to the RFP explained the results of the 2011 air sampling of OT3 depicted in Table 4:

> As an initial screen, these indoor air samples were compared to project screening levels, which were US EPA screening levels for residential properties. Although OT3 is not a residential property, the residential screening levels were used to provide a more conservative initial screen. In the indoor air samples, TCE was the only [Volatile Organic Compound] whose result exceeded its US EPA residential screening levels of 0.43μg/m$^3$ [micrograms per cubic meter] for cancer risk and 2.1 μg/m$^3$ for non-cancer risk. In OT3, samples were taken in enclosed offices/storage spaces as well as in the open areas within the building. TCE sample results ranged from 0.39 to 9.9 μg/m$^3$. All but two samples are above the project screening level for cancer risk and seven of the 12 samples are above the project screening level for non-cancer risk.

AR 297. The air samples closest to the Lease premises were AIR 11 AIR 12, and AIR 15, which had readings of 0.54 μg/m$^3$, 0.39 μg/m$^3$, and 1.4 μg/m$^3$, respectively - - amounts below the then EPA standard of 15 μg/m$^3$ for Region 9. AR 298, 325, 332.[7]

Attached to this ECP was a Regulatory Alert: TCE Short-Term Action ("TCE Regulatory Alert") notice that set forth provisional limits on TCE exposure, and showed that EPA Region 9 - - the region involving California - - set the maximum TCE concentration exposure for occupational work to be 15 μg/m$^3$ for a 10-hour work day. AR 331-32. The TCE Regulatory Alert provided the following guidance for TCE levels across the country:

| Agency | Concentration (μg/m$^3$) | Exposure Period Considered Significant by Agency | Receptor |
|---|---|---|---|
| EPA Region 3 | 2 | 24 hours | Residential |
| | 6 (previously 26) | 8 hours | Occupational |
| EPA Region 9 | 15 | One day (10 hours) | Occupational |
| EPA Region 10 | 2 | 21 days | Residential |
| | 8.4 | 21 days | Occupational |
| New Hampshire | 2 | Not stated | Residential |
| | 8.8 | Not stated | Occupational |
| New Jersey | 4 | One day (24 hours) | Residential |
| | 18 | One day (8 hours) | Occupational |

---

[7]     Defendant represented that "AIR 11 was in the RFP space, but [the sample] was taken in an area used for industrial – rather than personnel – purposes," that "AIR 12 was within the RFP space, but is believed to have been an incumbent computer room" and that "the Navy is uncertain of the exact location of AIR 15, and further uncertain about the incumbent's prior use for the space because the incumbent has vacated and the spaces have been altered by their new tenant, SPAWAR." Def.'s Resp. 12.

| Massachusetts | 2 | Not stated | Women of child-bearing age |
| | 20 | Not stated | "All receptors" |
| EPA [Regional Screeing Levels] | 2.1 | See below | Residential |
| | 8.8 | See below | Occupational |

AR 332.

To mitigate TCE contamination, the ECP restricted use of the Lease premises and required the Lessee to engage in management measures as follows:

1.  The subfloor utility vault area of the building is not part of the lease.  It is not to be entered due to potentially hazardous concentrations of VOCs in the air within the vault areas.

2.  The lessee is on notice that test results of the building's indoor air have revealed low concentrations of VOC contaminants, including TCE in the indoor air.  This is detailed in this ECP report, as are risk calculations based on US EPA guidance.  These calculations show a cancer and non-cancer health risk for commercial and industrial workers in the range that the lessee is required to manage.  Management measures include, but are not limited, to measures to enhance ventilation of indoor air to reduce contaminant concentrations.  Lessee also is required to monitor air contaminant concentrations over time to ensure that contaminant concentrations are kept below EPA and OSHA guidelines. This would necessitate the use of sampling protocols with the ability to detect chemicals at the lower EPA levels.  The monitoring program should include contingency measures to be taken if VOCs exceed certain concentrations.

3.  The lease does not authorize use or placement of storage units or other temporary structures on the parking lot due to unknown potential of vapor intrusion into these structures.

AR 301.

The February 3, 2014 Memorandum for the Record updating the environmental condition of the OT3 building, attached to the RFP, stated:

This memorandum is an update to reference [the ECP report] that was completed in September 2013 for the area to be leased.  Enclosure (1) is an update to [the TCE Regulatory Alert] of [the ECP].  The TCE Provisional Short Term Actions Levels fact sheet within [the TCE Regulatory Alert] provided examples of short-term action levels for trichloroethene (TCE) across the country.  Enclosure (1) contains a more recent example from Environmental Protection Agency (EPA) Region 9, which is the region that includes California.  Enclosure (1) is a letter from EPA Region 9 that recommends TCE Indoor Air Short-Term Response Action Levels be set at 7 micrograms per cubic meter ($\mu g/m^3$) for 10-hour work days and 9 $\mu g/m^3$

for 8-hour work days for commercial/industrial workers.  As illustrated in Table 4 of [the ECP], indoor air concentrations of TCE within building OT3, and its annex, ranged from 0.39 to 9.9 $\mu g/m^3$.  However, TCE concentrations within the southern end of building OT3, including the area to be leased, ranged from 0.39 to 1.4 $\mu g/m^3$ and <u>are below the proposed Short-Term Response Action Levels for commercial/industrial workers with 8- or 10-hour workdays, contained in enclosure (1)</u>.

Based upon these findings . . . it has been determined that no further action must be taken to document the environmental condition of the property or its suitability for the Navy to lease the property to an outside entity.  This does not change the conclusions or Land Use Restrictions and Controls in the Final ECP.

AR 268-69 (emphasis added).

The referenced "Enclosure (1)" contained the December 3, 2013 "EPA Region 9 Guidelines and Supplemental Information Needed for Vapor Intrusion Evaluations" for sites in the San Francisco Bay Area.  These guidelines included TCE Short-Term response action levels of 2 $\mu g/m^3$ for residential, 9 $\mu g/m^3$ for commercial/industrial for an eight-hour workday and 7 $\mu g/m^3$ for a 10-hour work day.  AR 270-73.

**<u>Industry Forum and Questions</u>**

On May 22, 2014, the Navy held an industry forum for potential offerors.  AR 215, 353.  During the forum, the Navy informed the offerors that it did not make its appraisal reports publicly available.  AR 360.  The Navy then held a question and answer session.  The AR includes Ms. Lacey Barnhill's[8] handwritten notes reflecting this session.  AR 379-82.  Ms. Barnhill's notes show the following exchange:

What is going on in Section 3 of the Lease Assignment & Subleasing?
- If Lessee chooses to do sublease & Gov't agrees – Gov't collects 50% of sublease amount.

This clause hurts small businesses.  Is there any way to change that?
- Has not seen in any other Gov't contract.  Why is this clause in there?
- Where did it come from?
     - It is required under this lease.
- Proposer will submit question.

AR 382.

On May 29, 2014, the Navy responded to 13 questions that Open Spirit submitted following the industry forum.  AR 564-67.  The first three questions involved the availability of the Government's appraisal of the OT3 building space.  AR 564.  The Government replied to Open

---

[8]     The AR does not provide Ms. Barnhill's job title or role in this Lease competition.

Spirit that it had not provided the incumbent access to appraisals and that "[t]he appraisal for the fair market rental value was . . . not releasable" as "the Navy is prohibited from releasing the appraisal or the contents therein" pursuant to the Navy's Real Estate Procedure Manual.  Id.

Open Spirit asked the following question about the 50 percent rent-splitting term:

The lease contains provisions for recapture of 50% in excess of contract value paid by LESSOR approved subtenants.  The Government representative indicated that paragraph 6.4 [of the Lease] was required in the lease and could not be altered.  Is there a law that requires this term to be included in a lease for a property that is approximately 100,000 square feet?  Please provide reference to the appropriate law, regulation, or other authority that supports the need to have this provision in the lease.

AR 565.  The Navy responded:

No law requires this lease provision.  The Navy determined this is a reasonable requirement for this lease, which was reviewed and approved by Navy higher level authority.  This is a typical provision that is included in Navy leases with various types and sizes of tenants.

AR 566.

With respect to the performance and security bond requirement in paragraph 4 of the Lease, Open Spirit asked:

The paragraph referenced above [Section 2.4 (a) 2] asks for "Evidence" of the Security as required under clause 4 of the lease.  Bidder needs clarification of the term "Evidence."  Since there is no awarded contract there is no way to receive a letter of credit or a surety bond without first depositing $750,000 with an institution. This is economically unreasonable since only one bidder will be awarded the contract.  Bidder has investors that will deposit $750,000, upon contract award, in a financial institution to form the surety collateral necessary to obtain a stand-by letter of credit.  Does a certification letter from the bidder (with the above statement regarding investor deposit) similar to the affirmation contained in NAVFAC SW RES FORM #0100 – AFFIRMATIVE STATEMENTS[9] constitute sufficient evidence to satisfy the requirements of the RFP?  If not, what does constitute sufficient "Evidence" of security?

AR 567 (alterations in original).  The Navy responded: "Yes," without elaboration.  Id.

---

9       NAVFAC SW RES FORM #0100 was attached to the Lease and required an offeror to affirm that it "shall, post-award, diligently pursue all necessary actions and be solely responsible for payment of any and all associated costs" and that the offeror understood and accepted "all of the terms and conditions of the lease and its Exhibits."  AR 393.

**Proposal Submissions**

### Open Spirit's Proposal

On June 11, 2014, Open Sprit submitted its proposal to Navy Realty Specialist Jennifer Arbesu.  AR 392.  In its proposal, Open Spirit affirmed that it had "read, underst[ood], and accept[ed] all of the terms and conditions of the Lease and its Exhibits." AR 393.

For the $750,000 performance bond, Open Spirit submitted a notarized letter from Surety Associates of Southern California, the entity that provided the bond.  AR 394-95.  Open Spirit did not report any past performance.  Open Spirit detailed how it would use the Lease premises and proposed to dedicate [***] to Light Industrial Use, [***] to Dry Laboratory Use, and [***] to Administrative Space.  AR 399-407.

Open Spirit proposed its rental rates for the five-year term:

| FIRM TERM – 5 YEARS | RENTAL RATE PER YEAR |
|---|---|
| Year 1 – January 1, 2015 through December 31, 2015 | [***] |
| Year 2 – January 1, 2016 through December 31, 2016 | [***] |
| Year 3 – January 1, 2017 through December 31, 2017 | [***] |
| Year 4 – January 1, 2018 through December 31, 2018 | [***] |
| Year 5 – January 1, 2019 through December 31, 2019 | [***] |

AR 411.

### Lockheed Martin's Bid

The incumbent, Lockheed Martin, originally submitted its bid at 3:55 p.m. on June 11, 2014, but submitted another bid on June 12, 2014, at 12:59 p.m.  AR 412, 487.  Realty Specialist Jennifer Arbesu testified that she "never opened any bid on June 11" and that she "put [the bids] in the safe." AR 2223.  Between June 11, 2014, at 3:55 p.m., and June 12, 2014, at 12:59 p.m., Ms. Arbesu apparently called Lockheed Martin or its representatives three times.[10]  AR 2888-89.  First, on June 12, 2014, at 6:38 a.m. for a conversation that lasted one minute and 42 seconds, second, on June 12, 2014, at 12:14 p.m. for a conversation of 42 seconds, and third on June 12, 2014 at 12:43 p.m.  Id.  Ms. Arbesu testified that the first call involved responding to a voicemail

---

[10]     Based on Plaintiff's allegation that the Navy had improper ex parte communications with Lockheed Martin, the Court granted Plaintiff's request for the production of Ms. Arbesu's telephone call log for June 11 and 12, 2014.  The Court permitted Plaintiff to depose Ms. Arbesu on "any communications with Lockheed after bids had been submitted regarding the solicitation." Tr. 46-47 (June 4, 2015).

left by a Lockheed Martin representative telling Lockheed that she had "received a message from them." AR 2224, 2227. Ms. Arbesu testified that she had no "specific recollection" of the second call but that at some point she "received a call from someone from Lockheed Martin stating that they were going to drop off a second offer." AR 2227-28. The third call occurred 16 minutes before Lockheed submitted its second bid, and Plaintiff did not question Ms. Arbesu about this call. Id.; AR 412, 2888-89.

With its second proposal, Lockheed Martin submitted a cover letter dated June 12, 2014, signed by its Contract Administrator, May Kemp, withdrawing its first submission:

> Lockheed Martin hereby withdraws referenced proposal [for RFP N6247314RP0007] which was submitted on 11 June 2014, with the exception of the contents of the white envelope labeled "Past Performance." The white envelope contains 2 sealed envelopes which contain Past Performance Surveys provided in support of Lockheed Martin.
>
> The withdrawn proposal is replaced by the proposal submitted today, 12 June 2014, in 2 white envelopes—one labeled "Package 1," containing the Original + 3 copies of the Technical Proposal and the second labeled "Package 2," containing the Original + 3 copies of the Rent Price Proposal. The above referenced Past Performance envelope goes with Package 1 and Package 2 envelopes.

AR 486.1.

In its offer, Lockheed Martin attached a copy of the Lease with some terms stricken through and several new terms added. See AR 442-83. Lockheed Martin included a cover letter to its proposal that stated:

> [T]he enclosed Technical proposal also includes a "Track Changes" copy of the Model Lease Agreement (first 42 pages, excluding drawings, tables, charts, etc., as no direct changes were made on those pages). The "Track Changes" copy provides insight into Lockheed Martin's understanding of the requirements and plans for performing in accordance with subsequent lease, as well as include information and/or propose terms suited to this offer. The "Track Changes" document also addresses clarifications that may have arisen as a result of the interpretation of Statement 3 of NAVFAC SW RES Form #0100 – Affirmative Statements.

AR 417. Affirmative Statement 3 of NAVFAC SW RES Form #0100 required the offeror to state that it "has read, understands, and accepts all of the terms and conditions of the Lease and its Exhibits . . . ." AR 419. Lockheed Martin made this Affirmative Statement 3 and submitted a performance and security bond. AR 419, 485-86.

Lockheed Martin proposed to use [***] of the Lease premises for Light Industrial, [***] for Dry Laboratory, and [***] for Administrative purposes. AR 422-26. Lockheed Martin submitted the following rental rates which were lower than Open Spirit's:

| FIRM TERM – 5 YEARS | RENTAL RATE PER YEAR |
|---|---|
| Year 1 – January 1, 2015 through December 31, 2015 | [***] |
| Year 2 – January 1, 2016 through December 31, 2016 | [***] |
| Year 3 – January 1, 2017 through December 31, 2017 | [***] |
| Year 4 – January 1, 2018 through December 31, 2018 | [***] |
| Year 5 – January 1, 2019 through December 31, 2019 | [***] |

AR 563.

**The Source Selection Evaluation Board's Draft Technical Evaluation**

The Source Selection Evaluation Board ("SSEB") conducted its technical evaluation of proposals from June 17 through June 19, 2014.  AR 2248.  There were three members on the SSEB - - Senior Realty Specialist Arbesu, Community Planner Muska Laiq, and Realty Specialist Leslie Geary.  AR 2903.  The SSEB found both proposals to be acceptable but noted weaknesses in both. AR 2905, 2907, 2909.

For Open Spirit, the SSEB determined that its proposed use of space was a weakness because Open Spirit designated certain space to be used for "contract and sub-contract performan[c]e to integrate info[rm]ation technologies into racks . . . ," but Open Spirit did "not affirmatively state what the proposed use in this space will be."  The SSEB did not believe that this rose to the level of a deficiency.  AR 2907.

For Lockheed Martin, the SSEB was concerned with the added terms and stricken-through terms to the Lease, stating:

- Offeror submitted the Government approved lease with "track changes" with its proposal.  The cover letter submitted with the proposal stated that the track changes provided "insight into Offeror's understanding of the requirements and plans for performing in accordance with subsequent lease and included information on proposed terms suited this offer."

- The above submission was interpreted by the board as an ambiguity in whether or not the Offeror would comply with the requirements of the RFP.  This ambiguity resulted in a weakness of the Offeror's proposal.

AR 2909.

The SSEB recommended award to Open Spirit, stating:

16

> SSEB recommends accepting Offer I from Open Spirit LLC as this represents the
> offer that [***] and is technically acceptable.

AR 2905 (redaction in original).  It is not clear from the record when this draft technical evaluation was prepared, but it is the product of Ms. Arbesu's notes memorializing "the consensus that was reached by the three members" of the SSEB during the June 17-19, 2014 meetings.  AR 2257, 2266.  This SSEB recommendation was never finalized and was not signed by the three SSEB members.  AR 2903.  Ms. Arbesu testified, however, that she "would have been surprised" if any of the three members of the SSEB would not have recommended award to Open Spirit.  AR 2266.

Following the June 2014 meetings, the SSEB submitted questions to the Navy's legal department to ensure that bids from both Open Spirit and Lockheed Martin were responsive to the RFP.  AR 2901-02.  Ms. Arbesu testified that the attorney assigned to this Lease competition generally took "a long time" to respond to questions and that he "took a significant amount of time on this case."  AR 2297-98.  She further testified that she followed up with counsel multiple times and by September 2, 2014, Navy counsel verbally informed Ms. Arbesu that both bids were responsive to the RFP and could be considered for award.  AR 2248-50, 2295-96, 2302-03.

## July 9, 2014 Change in EPA Guidelines

Meanwhile, on July 9, 2014, EPA issued a memorandum to its Region 9 Superfund Division Staff and Management setting forth new TCE level recommendations for the entirety of Region 9 - - the region where the Lease premises were located.  AR 863.  For an 8-hour work day, the EPA Region 9 guidelines were tightened significantly, lowering the cap from 15 $\mu g/m^3$ to 8 $\mu g/m^3$.  Compare AR 179, 210 with AR 865.  The memorandum provided the following:

| EPA Region 9 Interim TCE Indoor | | |
|---|---|---|
| *Exposure Scenario* | *Accelerated Response Action ([Hazard Quotient]=1)* | *Urgent Response Action Level ([HQ=3)*[4] |
| Residential * | 2 $\mu g/m^3$ | 6 $\mu g/m^3$ |
| Commercial/Industrial ** (8-hour workday) | 8 $\mu g/m^3$ | 24 $\mu g/m^3$ |
| Commercial/Industrial ** (10-hour workday) | 7 $\mu g/m^3$ | 21 $\mu g/m^3$ |

* The residential HQ=1 accelerated response action level is equivalent to the inhalation reference concentration (RfC) since exposure is assumed to occur continuously.
** The Commercial/Industrial accelerated response action levels are calculated as the time-weighted average from the RfC, based on the length of a workday and rounding to one significant digit (e.g., for an 8-hour workday: Accelerated Response Action Level = (168 hours per week/40 hours per week) x 2 $\mu g/m^3$ = 8 $\mu g/m^3$).  Time-weighted adjustments can be made as needed for workplaces with longer work schedules.
Note: Indoor air TCE exposures corresponding to these accelerated response action levels would pose cancer risks near the lower end of the Superfund target cancer risk range, considering the IRIS toxicity assessment; thus, the health protective risk range for both accelerated response

> action and long-term exposures becomes truncated to: $0.5 - 2$ µg/m$^3$ for residential exposures and 3-8 µg/m$^3$ for 8-hour/day commercial/industrial exposures.

AR 865.

In late August 2014, in view of the EPA's July 9, 2014 guidelines, the California Department of Toxic Substance Control ("DTSC") issued additional TCE recommendations. AR 590. Relevant here, the California DTSC provided testing procedure recommendations to ascertain when groundwater causes TCE air contamination:

> For sites with TCE contamination of groundwater or soil deemed to be of concern due to potential migration into indoor air, [California's Human Health Risk Office] recommends at least two indoor air samples in both warm and cool season regardless of the concentration detected in the first sample. If the first sample detects a relatively elevated concentration a second sample should be obtained more quickly than delaying for a seasonal change to occur. [California's Human Health Risk Office] would consider a sample result between 0.48 ug/m3 and 2.0 ug/m3 relatively elevated . . . . [California's Human Health Risk Office] recommends that a second indoor air sample be taken immediately where the first sample concentration is at or above 2.0 ug/m3 for a residential exposure scenario and above 8 ug/m3 for a commercial/industrial scenario, as a reasonable precaution.

AR 590-91 (quotation marks omitted).

As a result of these changing environmental guidelines by the EPA and California DTSC, in August 2014, the Navy began testing the air for TCE in certain areas of the OT3 building, but not the Lease premises. AR 860. This testing took place in the same locations as the sampling done in 2011, as depicted in the chart above, in order to compare the changes in TCE concentrations to prior sampling. Id. As of this time, the Navy had not made a decision on the Lease award because the SSEB was still awaiting answers from counsel on the technical acceptability of both Open Spirit's and Lockheed Martin's proposals. Therefore, no technical evaluation had been provided to the Contracting Officer for review. AR 2249, 2519-20.

The Navy's Product Line Coordinator for Environmental Restoration, Derral Van Winkle,[11] told the real estate team about the new EPA guidelines on September 8, 2014, and explained the TCE testing and its effect on the Lease in an October 23, 2014 declaration:

> As a result of the July 2014 EPA Region 9 revised guidelines, the Navy proactively conducted additional sampling of indoor air quality in August 2014 – in the same locations as the sampling done in connection with the 2011 Remedial Investigation. One such sample at the north end of OT3 read at 12 µg/m$^3$. However, the previous

---

[11]     At the time of the RFP's cancellation, Mr. Van Winkle had been employed by the Navy for five years. He previously spent 25 years working for environmental consulting companies conducting environmental restoration work for the Navy, other federal organizations, and private companies. AR 859.

reading at the southern end of OT3 of 9.9 µg/m$^3$ decreased to 7.2 µg/m$^3$. Additional sampling is anticipated for certain office spaces within OT3. The results of the additional sampling are anticipated to be available in early November 2014. At this time the Navy is unable to quantify the representative risk.

*    *    *

On September 8 and 9, 2014, I discussed with Jennifer Arbesu, Senior Realty Specialist . . . the recent changes to the United States Environmental Protection Agency ("EPA") Region 9 guidelines related to trichloroethylene ("TCE") exposure and potential health risk to users of buildings, such as OT3, including the proposed lease space, and I recommended that additional land use restrictions be included in the lease, in response to EPA's more stringent guidelines. Specifically, I recommended prohibiting the prospective lessee from bringing onto the leased premises or using pure TCE or any mixtures that include TCE, and chlorinated compounds or mixtures that include chlorinated compounds. I also advised that until more data is collected and evaluated, the lease may need to be revised to require the lessee to change the HVAC system or take other measures to improve ventilation.

AR 859-62.

Mr. Van Winkle's contemporaneous emails sent to Ms. Kathryn Stewart[12] and Ms. Arbesu on September 8 and 9, 2014, corroborate his October 23, 2014 declaration. AR 610-11, 616. In his September 8, 2014 email to Ms. Stewart sent at 6:19 p.m., Mr. Van Winkle stated:

Angie Lind[13] and I briefed [the Navy's Space and Naval Warfare Systems Command] ("SPAWAR") facilities personnel and SPAWAR 5.0 personnel[14] this afternoon regarding the environmental restoration indoor air sampling at SPAWAR Old Town Campus Building 3. The meeting did not go well.

*    *    *

Today as Angie and I briefed the [SPAWAR] 5.0 personnel, it was the first th[at] they were hearing of a TCE issue with indoor air. As part of the SPAWAR Operations investigation into the issues within the 5.0 work space facilities last year, I was asked to provide a brief to Ms. [Kimberly] Kesler [in Corporate Operations] and staff regarding the [Remedial Investigation] site 10/11

---

[12]    Ms. Stewart's role in the Navy is not clear from the record.

[13]    Angie Lind is a member of the Navy's Environmental Group.

[14]    SPAWAR 5.0 is the Navy component occupying space in the OT3 building.

19

investigations and findings, which I did in September 2013. EPA/DTSC guidance and proposed approach to indoor air has been revised significantly since that time.

SPAWAR 5.0 personnel have requested immediate medical testing to determine whether they have TCE in their bodies.

*       *       *

SPAWAR 5.0 personnel pointed out that they had a pregnant woman in the affected office space and were going to move her out immediately. They indicated that historically at least one other pregnant employee may have had symptoms that would be consistent with EPA's recent findings regarding health effects to an unborn fetus. There was some debate between 5.0 staff regarding whether the employee had actually been in the SPAWAR office space while pregnant.

Actions for follow up are as follows:

1) Restoration will provide indoor air sampling inside SPAWAR 5.0 offices as soon as possible. Any restoration sampling will look at turning around results as quickly as possible. SPAWAR Operations has also conducted recent sampling . . . and is going to investigate getting results as soon as possible.
2) SPAWAR Operations will follow up with medical testing requests and coordinate such tests.
3) SPAWAR Operations will provide restoration personnel maps of 5.0 indoor spaces and office construction to assist with sampling planning.
4) SPAWAR Operations will work pro-actively with restoration staff to review HVAC system issues, and office construction to define [if] mitigation measure can be enacted.
5) Restoration will provide a copy of the Draft [Record of Decision] to Rear Admiral Rodman.

AR 610-11.

At 9:15 a.m., on September 9, 2014 - - the date offers were set to expire - - Mr. Van Winkle wrote to Ms. Arbesu suggesting changes to the Lease terms:

Below please find some language for the lease regarding use of TCE or frankly other chlorinated solvents. I am providing two distinct sections – one specific to TCE and one more broad to include use of any chlorinated solvent/compound. I think the preference would be to use the broader definition since all chlorinated compounds have some toxicity, with TCE being one of the most pertinent and sensitive at this time.

The SPAWAR Old Town Campus has mixed use including industrial and office space within the building. The tenant shall not bring on to the premises or use pure TCE or any mixtures that include TCE within the building as this compound presents a potential risk to other building inhabitants. The tenant will provide, and

the Navy will inspect, a list of chemicals to be utilized within the leased space 7 days prior to bringing the chemicals within the facility.

The SPAWAR Old Town Campus has mixed use including industrial and office space in the building.  The tenant shall not bring on to the premises or use pure chlorinated compounds or any mixtures that include chlorinated compounds within the building as these chemicals present a potential risk to other building inhabitants.  The tenant will provide, and the Navy will inspect, a list of chemicals to be utilized within the leased space 7 days prior to bringing the chemicals within the facility.

AR 616.

In a follow-up to the above email dated September 9, 2014, at 10:29 a.m., and addressed to Contracting Officer Bixler and Ms. Arbesu, Mr. Van Winkle further stated:

Recently TCE in indoor air has become a focus of EPA because of one study that indicated particular toxicological effects on a very sensitive population (women in first trimester of pregnancy).  As a result, both the EPA and the [California] DTSC have followed up with guidance pertaining to detection of TCE in indoor air, and this guidance contains numbers for concentrations that are extremely low.  Since TCE has been detected in indoor air sampling previously conducted, we are recommending that no additional sources should be allowed in the Old Town Campus Building 3 which could only exacerbate or increase what has been observed.

AR 627.

The TCE testing in August 2014, in the Navy-occupied spaces showed TCE concentrations at 12 $\mu g/m^3$ and 7.3 $\mu g/m^3$.  AR 676.  These samples either exceeded or were close to the new cap established by the July 9, 2014 EPA Region 9 guidelines that limited TCE to 8 $\mu g/m^3$ for an 8-hour work day and 7 $\mu g/m^3$ for a 10-hour work day.  Id.  However, the Navy was unable to conduct TCE testing in the Lease premises in August 2014, because Lockheed Martin lacked the necessary sensitive equipment, and it was Lockheed's responsibility to do what testing it wanted in its spaces.  AR 2679, 2682, 2699.   Lockheed Martin provided the Navy with some internal testing results from July and October, 2014.  AR 2921; App. to Def.'s Mot. 5 ("DA").  Although the July 2014 testing results were within EPA limits for TCE air concentrations, the October 2014 testing results - - taken one month following cancellation of the RFP - - showed TCE levels above the EPA limits in four locations of the Lease premises with readings at 9.6 $\mu g/m^3$, 8.6 $\mu g/m^3$, 11 $\mu g/m^3$, and 9.0 $\mu g/m^3$.  AR 2921; DA 5-8.

**September 4, 2014 Evacuation of Personnel from the OT3 Building**

On September 4, 2014, five days before the cancellation decision, the Navy began to move people out of the OT3 building after a fire main pipe broke causing flooding.  AR 625, 627.  Evacuation of personnel continued through September 8, 2014.  AR 667, 853.  On September 9, 2014 - - the date offers were to expire - - Rear Admiral David Lewis, who worked for the Space and Naval Warfare Systems Command in the northern end of the OT3 building, wrote an email to

Rear Admiral Patrick Lorge, Commander of Navy Region Southwest, explaining his decision to evacuate personnel from the building:

> In the course of mitigating the water damage, your environmental folks took samples in IRT the existing chemical bloom under that end of the [OT3] building . . . for Trichloroethylene, an industrial solvent that was stored in that location for several years when that building was a bomber & rocket factory site (1940's – 1970's?).  EPA and California standards for that chemical are in the process of being changed (tightened), and samples taken last year, which were found to be safe, indicate that parts of the building would be borderline under the new standards.  The new EPA guidelines specifically call out concerns about pregnant women being affected in the first trimester.  Your team is also concerned that the water main break may have excavated contaminated soil and brought it to the surface, so your folks are also on tap to test the soil around and within the break site.
>
> I am concerned about returning workers, especially women of child-bearing age, into this area of the building.
>
> *       *       *
>
> Pending your guidance above, I am taking the following actions:
>
> 1. Leaving the first floor offices in the affected end of OT3 vacant.
> 2. Move women of child-bearing age to other office spaces in the SPAWAR Facility.
> 3. Notify employees of your statement of risk and be receptive to employees who wish to relocate to other spaces.

AR 624-25.

In addition to the water damage, individuals in the OT3 building had been complaining about respiratory ailments since 2013.  AR 680, 2683.  Tests were performed in 2013, and it was determined that formaldehyde in the desks, carpeting and other construction materials were causing symptoms.  AR 676.  Although these items were replaced and ventilation was improved, employees continued to experience respiratory symptoms.  Id.  When the Lease competition was underway in 2014, the Agency was in the process of ordering additional air quality testing for the OT3 building to try to determine the source of the employees' continuing respiratory symptoms.  Id.; AR 861.

**The Navy Failed to Give Lockheed Martin 180 Days Notice to Vacate the Lease Premises**

Lockheed Martin's license to use the Lease premises was in effect from May 2014 through April 2015, and included the Navy's option to terminate the license so long as the Navy provided Lockheed Martin with 180 days notice. AR 3038.  However, the Lease start date was set for January 1, 2015, and as of September 5, 2014, Lockheed Martin still occupied all the space

included in the subject Lease.  AR 219, 2352.  On September 5, 2014, while starting to draft an award letter to Open Spirit and finalize the SSEB recommendation to Contracting Officer Bixler, Realty Specialist Jennifer Arbesu noticed that the Navy had failed to provide Lockheed Martin notice to vacate the Lease premises by the January 1, 2015 Lease start date.  AR 2351-52.

Ms. Arbesu testified that in the course of drafting an award letter to Open Spirit on September 5, 2014:

> I realized that I had forgotten to write a notice to [Lockheed Martin] . . . . And it sort of sent me on another trajectory.  And I went to counsel and asked . . . if they could provide a legal opinion as to what I could do in terms of I had forgotten to provide the notice.  Typically, on a license, 180 days is not required.  On this particular license, it is - - or it was.  I had forgotten about it . . . . So then I went to counsel.  I believe it was late in the day.  And they - - I wasn't going to get an answer that day.
>
> *     *     *
>
> I recall going to counsel's office and asking what, if anything, can be done.  If my recollection is correct, my - - the attorney that normally helps me wasn't available.  He wasn't there.  So I spoke with another attorney that was familiar with this particular project . . . .  She said that she would look into it to see if there was anything that could be done with regard to the termination of the license prior to the 180-day requirement or whether or not we could change the start date of the lease . . . .
>
> Then comes Monday [September 8, 2014].  And I'm unsure, without referring back to some of the record, whether it was Monday that we find - - found out about the environmental issue at OT3 that was brought to the attention of real estate or whether that was on Tuesday morning.
>
> So with the coming of those two issues, I did not continue to pursue getting the SSEB recommendation signed by all the board members because I - - there were other things that seemed to be taking priority.

AR 2352-53.

## Cancellation Decision

Contracting Officer Bixler was not informed of the July 9, 2014 EPA revised guidance on TCE air concentration levels until September 8, 2014 - - the day before the cancellation of the RFP.  AR 629, 636, 2522.  Contracting Officer Bixler testified that "somewhere around [September] 8th . . . the environmental department . . . brought it to the real estate department's attention that recent changes in EPA guidelines for volatile organic compounds, particularly . . . TCE in occupied buildings had just been increased."  AR 2522.  The Navy's environmental point person, Derral Van Winkle, testified that he first informed the real estate group of the increasing

TCE levels on September 8, 2014.  AR 616, 860-62.  On the same day, Contracting Officer Bixler was made aware of the Navy's evacuation of personnel from the building.  AR 636.

The next day, on September 9, 2014, Contracting Officer Bixler canceled the RFP based on "changes in Government requirements."  AR 573, 2533-34.  Contracting Officer Bixler believed that the Navy could not "continue with the RFP based on safety" and needed to "straighten out the [Environmental Condition of Property Report], the lease, the RFP, and understand what these new EPA guidelines entail[ed]."  AR 2529.  In a September 10, 2014 email contemporaneous with his cancellation decision, Contracting Officer Bixler wrote to Captain Darius Banaji, the then-commanding officer of Naval Facilities Engineering Command Southwest, apprising him of the cancellation decision:

> We have canceled Request for Proposal (RFP), for the use of [Department of Navy] spaces at Old Town 3, due to changed requirements.
>
> - Changed requirements resulted from last minute information received from the Environmental Core team regarding recent changes in EPA guidelines which may impact the scope of the management required under the lease; possibly requiring additional language changes in the proposed new lease; ECP; and the RFP to restrict the use of specific chemicals on the leased premises.  This new information was not known at the time we issued the RFP, nor prior to the receipt of bids.
>
> - As the [Real Estate Contracting Officer], and after full consultation with Counsel; Env; and the Base [Public Works Officer], I made the decision as the RECO to cancel the RFP out of concerns and caution for human health, as well as consideration of having no opportunity to receive offeror resubmissions of bids in time prior to expiration of the RFP solicitation period.

AR 579; see AR 81.

Mr. Bixler testified that his decision to cancel the RFP, rather than update it, was based in part on the lack of time to investigate the environmental condition of the property:

> We had no time at all.  We had less than 48 hours to make a decision as to either award or bring it back in, find out what these guidelines were going to do to that building, get the building up to speed to the point that it could be leased out again, and then resubmit - - redo the ECP, redo the RFP, redo the lease, and then send it back out for another new RFP.
>
> *       *       *
>
> Cancellation decision was based upon abundance of caution.  I erred on the side of judgment.  And I did not want to read about this in the morning paper, where the government had leased out a facility that was obviously - - had issues with it.  And if we're escorting expectant mothers and other sensitive receptors out of the building, that was the worst thing you possibly could have ever done.

AR 2533, 2537.

When asked why the RFP could not simply have been modified to extend time for bids, Contracting Officer Bixler testified:

> We have gone out before and modified an RFP to - - to extend it, to extend the time for bids.  But at this point, this was so voluminous and so - - so much was going to be involved in getting this building or - - again, we had, - - we had a situation on our hands where we had people that didn't want to work in the building anymore.
>
> And that's a public issue that was going to take us - - we didn't have an idea of how much time it was going to take us to get people comfortable to get back in the building.  It just doesn't happen overnight.

AR 2542-43.

When asked about whether he believed that the terms of the Lease sufficiently addressed TCE to give notice to bidders, Contracting Officer Bixler testified:

> No, sir, not to the sufficiency that I felt was necessary.  There was - - in addition to that, we had recent experience of - - of occupants in that building that had been relocated, the women that were of childbearing age, women that were in their first trimester of their pregnancy.  Tech leadership had also made it known to their employees that even if you are comfortable with this, we will relocate you, and that - - those - - those actions were ongoing at that time.
>
> *          *          *
>
> There could have been an obvious requirement for offerors to have to go back and review their bids.  There were - - because of the EPA guideline changes, there were very strong possibilities of them having to redo their bid to take in additional air sampling, monitoring, reporting, changes to [Heating Ventilation and Air Conditioning] systems, air movement.  There were chemicals that were being listed in that new update that could not be in that building any longer.
>
> It would change their bid and the cost of them performing that bid or that lease that they need to be aware of.  So that was one consideration.

AR 2523-24, 2532-33; see also AR 2566-67.

## The Contracting Officer's Memorandum to File

Following the RFP's cancellation, between September 9 and October 6, 2014, Contracting Officer Bixler issued a Memorandum to File, with input from members of the NAVFAC Southwest team, including representatives from the environmental group, counsel and Ms. Arbesu, explaining that his cancellation decision was based on the Navy's "concerns raised by recent changes in EPA

guidance related to TCE exposure risk" and its "inability to honor a start lease date of January 1, 2015, because of conflicting requirements in its current lease."  AR 574, 577, 2555-56, 2991-92.[15]

With respect to the TCE exposure risk, Contracting Officer Bixler stated:

The Environmental Core team notified the Real Estate core team on Monday, September 8, 2014 of the July 2014 revised EPA Region 9 guidelines.  As a result of the July 2014 EPA Region 9 revised guidelines additional sampling of indoor air quality was conducted in August 2014—in the same locations as sampling done in connection with the 2011 Remedial Investigation.  One such sample at the north end of the building read at 12 µg/m3.  However, the previous reading at the southern end of the building of 9.9 µg/m3 decreased to 7.2 µg/m3.  Additional sampling is anticipated for certain office spaces within the building.

                    *        *        *

In addition, another tenant of the property (in the northern end of the building) . . . decided to remove from the building some of the more sensitive receptors, including pregnant women, women of child-bearing age, and others who were uncomfortable, until more data could be obtained.  Some people had been experiencing symptoms, such as respiratory ailments.  As a result, tests were performed, and it was determined that formaldehyde in the new construction materials, such as the desks and carpet, were causing the symptoms, which were replaced.  In addition, ventilation was improved.  However, some of the employees continued to experience symptoms.  Thus, employees have been moved to upper floors of the building, or to other buildings, while additional air quality testing has been ordered.  The current tenant [the Navy's Space and Naval Warfare Systems Command] is very concerned about vapor intrusion, particularly in light of the July 2014 EPA Region 9 revised response action levels.

Need for [Environmental Condition of Property Report] Update and Revised Lease. Because previous changes in EPA Region 9 guidance triggered a Memorandum for the Record to update the Original ECP, which was included in the disclosures in the competitive process and the proposed Lease, the [Real Estate Contracting Officer] determined that the July 2014 EPA Region 9 guidance also triggers a need for an ECP update.  Moreover, additional language/land use controls may be required to be included in the Lease clearly putting the Lessee on notice for the known hazardous materials that will not be allowed on the Leased Premises under the Lease.  Further, until more data is collected and evaluated, the Lease may need to be revised to require the lessee to change its HVAC system or take other measures to improve ventilation.  Thus, the Lease and the ECP may need to be revised (and re-advertised) to include a notice of the change in EPA guidelines,

---

[15]     As explained below, the Court grants Plaintiff's motion to supplement the AR with the Memorandum to File.  AR 574-77.

updated air quality testing results, a revised determination of suitability to lease, and any updates to the Land Use Controls documented in the Lease and ECP.

Potential Effect on Offeror Bid. These changes to the EPA Region 9 guidelines impact the scope of management of indoor air quality required under the Lease. Because EPA guidelines have become more stringent, the cost to manage indoor air quality (a cost to be borne by the successful offeror under the term of the Lease) may be greater.  This change in cost could lead to claims of increased costs by the offeror.

AR 576-77.

There was an additional reason for cancelling the RFP – the Navy's failure to provide the incumbent licensee - - Lockheed Martin - - with the requisite 180-day notice to vacate the Lease premises by the Lease start date of January 1, 2015.  AR 577.  Contracting Officer Bixler explained:

Inability to provide 180 Day Notice to Vacate.  The Lease included in the RFP provided a start date of January 1, 2015.  However, the property is currently under license, with an expiration date of April 30, 2015.  Normally licenses are revocable at will; however previous counsel negotiated with the licensee to allow time to vacate if terminated early.  Special Provision 11(a)(i) states that "LICENSEE shall have one hundred eighty (180) days to vacate the Licensed Property from the date LICENSOR provided LICENSEE with written notice to terminate during which time LICENSEE can continue to operate on the Licensed Property."  Due to the foregoing license provision, the Navy is unable to issue the Lease with a start date of January 1, 2015.

Id.

**Environmental Remediation Efforts**

Shortly after the cancellation of the RFP on September 9, 2014, the Navy began its environmental remediation.  AR 2726.  The Navy's Public Works Officer for Naval Base Point Loma, Commander Chad Koster, testified that the Navy's environmental remediation efforts are being conducted by the Environmental Group of the Naval Facilities Engineering Command Southwest ("NAVFAC"), and include sealing cracks in the foundation, sewer vents, and electrical systems throughout the OT3 building, putting in place a subsurface vapor extraction system, as well as testing to address the vapor intrusion into the OT3 building.  AR 2704-07.  Commander Koster further testified that the air conditioning system had been changed since 2014, because of the TCE contamination, and that NAVFAC instituted air sampling requirements to keep TCE levels below EPA and OSHA guidelines.  AR 2717.  Commander Koster emphasized that the Navy had to remediate the entire OT3 building, not just the areas with the highest TCE testing levels, because "[t]here was enough unknown from the experts on the variability with which soil vapor, gas, gets into a building that the prudent thing was to do the entire facility."  AR 2708.

A full scale clean-up of contaminated ground water is expected to be completed in 2018, which involves drilling holes into the groundwater plume and putting olive oil and bacteria into the holes.  AR 848, 865, 2716-17.  In December 2014, four months after Contracting Officer Bixler's cancellation decision, the Navy's Space and Naval Warfare Systems Command ("SPAWAR") requested to use the Lease premises.  AR 2711, 2724.   Following the initial remediation efforts and a renovation of the former Lockheed space, SPAWAR moved into the Lease premises in April 2016 - - nearly a year and a half after the original Lease start date of January 1, 2015.  AR 2724.  To ensure the Lease premises are safe, the NAVFAC Environmental Group is conducting quarterly air sampling.  AR 2716.  The Navy has not resolicited the lease and does not intend to resolicit the lease.  Koster Decl. ¶¶ 3, 4 (Nov. 20, 2015); AR 2672-74.

## Procedural History

### Plaintiff's GAO Protest

On September 19, 2014, Open Spirit filed its initial protest before the Government Accountability Office ("GAO"), and on October 15, 2014, a supplemental protest objecting to the cancellation of the RFP and arguing that the cancellation decision was a "pretext in order to award the contract to Lockheed Martin."  AR 670-71, 1008.  On December 15, 2014, GAO denied Plaintiff's protest, finding the cancellation was reasonable because "there were superseding environmental concerns affecting OT3 that called into question the adequacy of the RFP."  AR 2012.  GAO did not reach Open Spirit's arguments that the Navy was biased in favor of Lockheed Martin.  AR 2008, 2013.

### Proceedings Before this Court

On April 13, 2015, four months after GAO issued its decision, Plaintiff filed its complaint in the United States Court of Federal Claims.  Plaintiff raised a new argument that the Navy's submission to GAO of its Memorandum of File constituted bad faith because the Memorandum to File was a post hoc rationalization.  Compl. ¶¶ 35, 58.  Plaintiff additionally argued for the first time that the Navy had improperly given Lockheed Martin information - - such as the appraisal reports - - that had been withheld from Plaintiff.  Id. at ¶¶ 27-28.

Based on the record and Plaintiff's new protest grounds of bad faith and favoritism, the Court permitted Plaintiff to conduct limited depositions of three Navy personnel - - Real Estate Contracting Specialist Arbesu, Contracting Officer Bixler, and Commander Koster, the Public Works Officer for Naval Base Point Loma.  Order (Nov. 12, 2015).  The Court granted Plaintiff's request to supplement the AR with the deposition transcripts.  Order (Aug. 3, 2016).  Briefing concluded on December 22, 2016.[16]

---

[16]      Briefing was delayed after Plaintiff filed a motion for Rule 37 sanctions on January 25, 2016, which necessitated that the Court conduct an in camera review of documents the Navy withheld as privileged.  Following denial of this motion, Plaintiff filed a second motion for Rule 37 sanctions on April 4, 2016, which the Court denied on May 13, 2016.  On that same day, May 13, 2016, Plaintiff sought to revise the briefing schedule to accommodate a third motion for sanctions under Rule 37 and a motion for Rule 11 sanctions.  ECF No. 155.  The Court denied

In its motion for judgment on the AR, Plaintiff lodges two protest grounds:

1. The Navy had no reasonable basis to cancel the RFP; and

2. The Agency acted in bad faith "in shaping the solicitation in a way to preclude small businesses" and in conducting ex parte communications with the incumbent.

Pl.'s Mot. 20.

## Discussion

## Jurisdiction and Standard of Review

This Court has jurisdiction over bid protest actions pursuant to 28 U.S.C. § 1491(b) (2012). The Court evaluates bid protests under the Administrative Procedure Act's standard of review. Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005) (citing Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001)). Under this standard, the Court will set aside an agency's procurement decision if the agency abused its discretion or acted arbitrarily, capriciously, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A) (2012); Adams & Assocs., Inc. v. United States, 741 F.3d 102, 105-06 (Fed. Cir. 2014); Ala. Aircraft Indus., Inc. - Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009). If this Court finds that the agency's actions were contrary to law or regulation, the plaintiff must also show that the violation was prejudicial in order to obtain relief. Bannum, 404 F.3d at 1351; Caddell Constr. Co. v. United States, 125 Fed. Cl. 30, 51 (2016).

The Court's jurisdiction extends to an agency's decision to cancel a solicitation. Madison Servs., Inc. v. United States, 92 Fed. Cl. 120, 125-26 (2010); FFTF Restoration Co., LLC v. United States, 86 Fed. Cl. 226, 236-37 (2009). In the context of a negotiated procurement, where a contracting officer has discretion to cancel a solicitation, the agency's cancellation decision requires only "'a coherent and reasonable explanation of its exercise of discretion.'" Madison Servs., 92 Fed. Cl. at 126 (quoting Impresa, 238 F.3d at 1333). As such, an agency's cancellation decision in the course of a negotiated procurement is "reduc[ed] to nothing more than rational-basis review." Id.; see Coastal Corp. v. United States, 6 Cl. Ct. 337, 344 (1984) ("[T]he absence of regulations strongly suggests that there are no constraints on the cancellation of a negotiated procurement, other than the normal ones applicable to all agency action: that it be free from arbitrariness, capriciousness and abuse of discretion."); Am. Gen. Leasing, Inc. v. United States, 587 F.2d 54, 58-59 (Ct. Cl. 1978) (finding a cancellation of a solicitation to be reasonable and stating that "[i]t is settled law that no assurance exists that [any] contractor will receive an award

_____

Plaintiff's request to file these motions and ordered Plaintiff to file any motion to supplement the AR by June 14, 2016. ECF No. 157. Briefing on Plaintiff's motion to supplement the AR was completed on July 20, 2016, and the Court granted this motion in part on August 3, 2016. ECF No. 161.

Briefing on the cross-motions for judgment on the AR was further delayed by Plaintiff's requests for additional time. ECF Nos. 163, 168.

and that the Government retains, in its discretion, the right to reject all bids without liability, even after there have been extensive negotiations with a bidder").

A protestor can show an agency acted in bad faith if its allegations are supported by "almost irrefragable" proof. Galen Med. Assocs. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004) (quoting Info. Tech. Applications Corp. v. United States, 316 F.3d 1312, 1323 n.2 (Fed. Cir. 2003)). "Almost irrefragable proof" amounts to "clear and convincing evidence" of some "specific intent to injure" the protestor. Id. (quoting Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1239-40 (Fed. Cir. 2002)); Palantir USG, Inc. v. United States, 129 Fed. Cl. 218, 245 (2016), appeal docketed, No. 17-1465 (Fed. Cir. Jan. 10, 2017).

Under Rule 52.1 of the Rules of the Court of Federal Claims, the Court makes findings of fact as if it were conducting a trial on a paper record. See Bannum, 404 F.3d at 1354. Looking to the AR, the Court must determine whether a protester has met its burden of proof based on the evidence in the record. Id. at 1355 (internal citations omitted). Supplementation of the AR is warranted if "'the omission of extra-record evidence precludes effective judicial review.'" Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1380 (Fed. Cir. 2009) (quoting Murakami v. United States, 46 Fed. Cl. 731, 735 (2000), aff'd, 398 F.3d 1342 (Fed. Cir. 2005)); Impresa, 238 F.3d at 1338.

## Supplementation of the Administrative Record

Plaintiff seeks to supplement the AR with approximately 310 pages of material. Pl.'s Second Mot. to Suppl. 2-6, ECF No. 165. "[T]he focal point of judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." Axiom, 564 F.3d at 1379 (quoting Camp v. Pitts, 411 U.S. 138, 142 (1973)); AshBritt, Inc. v. United States, 87 Fed. Cl. 344, 366 (2009). Therefore, the party seeking to supplement the administrative record must "separately analyze each document proffered for supplementation" and articulate why a particular document or category of documents is necessary for effective judicial review. Axiom, 564 F.3d at 1370; L-3 Commc'ns Integrated Sys., L.P. v. United States, 98 Fed. Cl. 45, 52 (2011); Terry v. United States, 96 Fed. Cl. 156, 162 (2010) ("[S]upplementation of the administrative record is not automatic, and the 'flexiblity of the court's scope of review does not give the parties carte blanche to supplement the record.'" (internal citations omitted)). Alternatively, the Court may accept documents in the Court's record that "may contain material outside the administrative record relating to questions of prejudice and relief." East West, Inc. v. United States, 100 Fed. Cl. 53, 55 (2011); AshBritt, 87 Fed. Cl. at 367.[17]

---

[17]    The Court agrees with the parties that the documents labeled AR 2732-41, 2872-78, 2882-99, 2920-23, 2990-93, and Defendant's documents labeled DA 1-8 should be included in the AR. Plaintiff also proffers multiple documents that are already part of the current AR, making its requested supplementation unnecessary and wasteful. These documents include the Lockheed Martin license agreement in effect from May 1, 2014, through April 20, 2015, AR 891-902, and the EPA Region 9 TCE Guidance dated July 9, 2014, AR 863-68.

Plaintiff seeks to include five draft copies of the Memorandum to File in the AR "to show that the [Memorandum to File] in the AR was purposely left without a date in order to back-date the document since the earlier copies show a month and a date." Pl.'s Second Mot. to Suppl. the AR 574-77. These draft copies, unlike the undated copy of the Memorandum to File in the AR, all list a date of September 2014. In response to Plaintiff's Interrogatory No. 18, Defendant stated that the Memorandum to File was written between September 9 and October 6, 2014. See Def.'s Second Resp. to Pl.'s First Set of Interrogs. 2 (Sept. 4, 2015). Defendant objects to the inclusion of these documents on the ground that Plaintiff does not reference these draft documents in its legal argument. However, Plaintiff does argue that the undated Memorandum issued after the cancellation decision improperly puts forth a post hoc rationale for the Navy's actions. The Court finds that the earlier September 2014 drafts of the Memorandum to File are necessary for effective judicial review to assess Plaintiff's challenge to the bona fides and timing of the Navy's cancellation decision. As such, the Court supplements the AR with AR 574-77, 2941-86.[18]

Plaintiff seeks to add to the AR the Navy's October 2, 2014 PowerPoint presentation on the EPA's new Region 9 Response Action Levels for TCE, as well as emails dated July 8, August 13, and August 29, 2014, from two Navy employees to Contracting Officer Bixler requesting a status update on the progress of the Lease. Pl.'s Second Mot. to Suppl. 5-6; see AR 2931-40, 2912, 2924-26. However, Plaintiff has not suggested why these documents should be included in the AR, and neither party has cited them in arguments on the merits. As such, the Court declines to supplement the AR with AR 2931-40, 2912, 2924-26.

Plaintiff seeks to supplement the AR with documents that address Solicitation terms. First, Plaintiff seeks to add drafts of the Lease with a Navy employee's comment that subleasing should not be allowed. AR 2842-71. In a similar vein, Plaintiff seeks to supplement the AR with a document it claims suggests that a security deposit should not have been required here - - the Marine Corps Air Station Miramar Management Plan. AR 2994-3027. These documents would only be relevant to Plaintiff's challenge to the Solicitation's inclusion of the rent-splitting subleasing and security deposit terms. However, Plaintiff waived these arguments by not protesting prior to the close of bidding. See COMINT Sys. Corp. v. United States, 700 F.3d 1377, 1382-83 (Fed. Cir. 2012); Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1315 (Fed. Cir. 2007). As such, the draft Lease with commentary and the Miramar Management Plan are not necessary for effective judicial review. See Axiom, 564 F.3d at 1381.

Plaintiff seeks to supplement the AR with internal Navy emails dated October 2013, about preparing the Lease for review by Navy headquarters - - months before the lease package was finalized or the RFP was issued. Plaintiff provides no explanation as to why these emails are relevant to Plaintiff's protest grounds, stating only that they are not part of the AR. However, a document's mere absence from the AR is not a legal basis for granting supplementation. E.g.,

---

[18]     Plaintiff argued that the Navy "concealed Source Selection Documents" by asserting that the Navy has produced "neither any final evaluations, nor any source selection decisions." Pl.'s Mot. 14. However, document production and three depositions confirmed that there was no final source selection decision prior to cancellation - - only the draft indicating that the SSEB planned to recommend award to Open Spirit. AR 2905. As such, Plaintiff's serious accusation that Defendant concealed source selection documents is wholly unfounded.

Tauri Grp., LLC v. United States, 99 Fed. Cl. 475, 481 (2011) ("Of course, in a bid protest, the administrative record need not consist of every single document related in any way to the procurement in question, but may be reasonably limited to materials relevant to the specific decisions being challenged."). There is no basis to supplement the AR with these emails.

Plaintiff seeks to supplement the AR with Ms. Arbesu's notes taken during the SSEB's meetings on June 17-19, 2014, and the SSEB's draft technical evaluation recommending awarding the Lease to Open Spirit. Because Ms. Arbesu's notes and the SSEB's draft technical evaluation are part of the Agency's documentation leading up to its cancellation decision, they reflect what transpired in the Lease competition, are not post hoc rationales, and are necessary for effective judicial review of the cancellation decision as well as Plaintiff's claims of bad faith and favoritism. As such, the Court grants Plaintiff's request to supplement the record with AR 2900-11.

Plaintiff seeks to supplement the AR with a "meeting reminder" on Commander Koster's electronic calendar for a September 12, 2014 meeting with Mike Costello, a Lockheed Martin employee who worked in the OT3 building. The meeting reminder contains no text aside from the location of the meeting. Plaintiff argues that this meeting reminder "is needed to show that the Agency was communicating with Lockheed bid personnel while OPEN SPIRIT could not get a response to the reason for cancellation." Pl.'s Second Mot. to Suppl. 6. Commander Koster testified that he held this meeting with Mr. Costello to provide Lockheed Martin the "same brief that we had provided to the Navy tenants" regarding the Navy's knowledge of TCE and what testing had been done at the time. AR 2685. As the meeting reminder forms a basis for Plaintiff's claim of bias and corroborates Commander Koster's testimony, the Court finds that the document is necessary for effective judicial review and grants Plaintiff's request to add this document to the AR.

Plaintiff seeks to supplement the AR with the declaration of William Bowersox, a former Lockheed Martin employee, who testified that Lockheed Martin had seen the Navy's 2011 appraisal values of the OT3 property. Mr. Bowersox, Lockheed Martin's former on-site representative at the OT3 building, testified that in 2011, he "witnessed the Appraisal agents evaluate the facility and was a party to the final Appraised value numbers as they were transmitted to [him] through the Lease renewal documents." AR 57, 2989. Plaintiff argues that Mr. Bowersox's declaration "contradicts the Agency's assertion that the appraisals were not shown to the incumbent" and that the incumbent "would have received an advantage in bidding when other bidders were not provided the same information." Pl.'s Second Mot. to Suppl. 6. Defendant counters that the issue before the Court is not whether the incumbent had ever seen prior appraisals, but whether the incumbent saw the appraisal that was to set the fair market value for the Lease at issue - - a topic Mr. Bowersox does not address. Def.'s Reply 35. Although Defendant is correct that Mr. Bowersox's testimony only addresses earlier appraisals, Plaintiff has alleged favoritism and bad faith due to Lockheed Martin's access to information unavailable to other bidders. As Plaintiff relies upon this testimony for its bad faith argument, the Court adds this testimony to the record to permit meaningful judicial review of that allegation. Axiom, 564 F.3d at 1380. The Court supplements the AR with Mr. Bowersox's declaration at AR 2988-89.

**The Navy's Decision to Cancel the RFP was Reasonable**

A contracting officer's decision to cancel a solicitation is "inherently discretionary." Shields Enters., Inc. v. United States, 28 Fed. Cl. 615, 636 (1993) (citing Am. Gen. Leasing, 587 F.2d at 5859)). An agency's need to "reassess its requirement . . . articulated at the time of the cancellation," can alone provide a reasonable basis for cancelling a solicitation. Shields, 28 Fed. Cl. at 636; see Madison Servs., 92 Fed. Cl. at 126 ("[T]he regulatory standards for the cancellation of a negotiated procurement are so extraordinarily permissive that they impose no constraints upon a contracting officer's discretion beyond what reasoned judgment requires.").

Plaintiff argues that the Navy's decision to cancel the RFP lacked a reasonable basis because "there was no change in the governmental requirements" that affected the Lease property as the lessee "bore the risk for any changes in EPA requirements." Pl.'s Mot. 24. Plaintiff contends that the "Compliance with Law" paragraph 14.1 of the Lease placed the burden on the Lessee to address any changes in environmental requirements.

Paragraph 14.1 states:

14.1 Compliance with Law. LESSEE and its officers, employees, agents, contractors, subcontractors, and SubLessees shall comply at its sole cost and expense, with the Federal, state, and local laws, regulations, and standards that are or may become applicable to LESSEE's activities on the Leased Premises. The intent of this paragraph 14 is to allocate responsibility for compliance with and cost of any kind of authority that could apply to the Government or the LESSEE as a result of LESSEE's use and occupancy of the premises to the LESSEE. That responsibility is entirely allocated to the LESSEE. The Government is not responsible for costs arising from LESSEE's use and occupancy of the premises.

AR 243 (emphasis added). This Compliance with Law provision addresses the lessee's activities on the Lease premises and the lessee's need to comply with environmental regulations stemming from the lessee's use and occupancy of the Lease premises. Paragraph 14.1 does not address pre-existing contamination resulting from the prior use of the Lease premises, or conditions that inhere in the Lease property unrelated to the lessee's occupancy or activities. Here, the TCE levels and vapor intrusion that caused the Navy's concern were discovered and exacerbated during the Lease competition and were present in the Lease property before the Lease became effective. The fact that a potential lessee would have to bear the cost of future regulatory compliance did not alleviate the Navy's concern about the impact of changed environmental conditions on the instant Lease competition.

Although the RFP alerted offerors to potential environmental issues at the time it was issued on May 13, 2014, and anticipated that award would be made by September 9, 2014, this landscape radically changed while the Lease competition was ongoing. AR 215, 226-27. On July 9, 2014, the EPA's guidance with respect to permissible levels of TCE air contamination was made significantly more restrictive - - lowering acceptable levels of TCE from 15 micrograms per cubic meter ($\mu g/m^3$) for a 10-hour work day to 8 $\mu g/m^3$ for an 8-hour work day for commercial and industrial use for Region 9 where the Lease is located. Compare AR 332 with AR 865. The

Navy's environmental point person on this Lease competition, Derral Van Winkle, a seasoned veteran with 30 years of environmental restoration experience, had the unenviable task of briefing the SPAWAR command on "the environmental restoration indoor sampling" following issuance of the new guidelines on the day before offers were to expire.  Mr. Van Winkle's meeting with the command "did not go well."  AR 610.  Two Navy Rear Admirals were seriously concerned about the health and safety of personnel and ordered personnel to evacuate the building.  This action stemmed not only from the heightened environmental restrictions and TCE levels but from unfortunate flooding caused by a water main break days earlier resulting in excavation of contaminated soil.  AR 625.

The new EPA guidance also led the Environmental Group to recommend that Contracting Officer Bixler change the Lease to ban all chlorinated solvents from the OT3 building and institute a protocol to inspect any chemicals brought into the building.  AR 616.[19]  These new use restrictions were not part of the Lease being competed.  This Lease only required a lessee to "enhance ventilation of indoor air," "monitor air contaminant concentrations," and "include contingency measures to be taken if VOCs exceed certain concentrations."  AR 241.  However, given the new EPA guidelines and issues in the building, as Contracting Officer Bixler articulated, "there were very strong possibilities of [offerors] having to redo their bids to take in additional air sampling, monitoring, reporting, changes to HVAC systems, air movement.  There [were] chemicals that were being listed in that new update that could not be in that building any longer."  AR 2532-33.

The Navy was confronted with this cascade of environmental issues just after the SSEB had completed its review of offers on September 5, 2014, and drafted its recommendation to award to Plaintiff.  Because offerors' bids expired on September 9, 2014, Contracting Officer Bixler had less than 48 hours to decide whether to proceed with the competition once he became fully aware of the environmental issues on September 8, 2014.  As the Public Works Officer, Commander Koster, testified, because the Navy was not able to conduct any TCE testing in the Lease premises at that time, the Navy was uncertain as to "the risk to people and to the Navy – from a legal standpoint."  AR 2681.  This Court finds that legitimate environmental concerns prompted the Navy to cancel the Lease competition - - not bias against Open Spirit or favoritism toward Lockheed Martin.

The Navy's environmental concerns were later found to be justified as all four TCE samples taken in the Lease premises in October 2014 - - the month following the cancellation decision - - exceeded the new EPA and California DTSC guidelines.  See DA 5-8.[20]  The Navy conducted remediation efforts to mitigate TCE vapor intrusion in the OT3 building following the cancellation decision by sealing cracks in the foundation, sewer vents, and electrical systems,

---

[19]     This new ban on chlorinated solvents could have affected Open Spirit's own bid, as Open Spirit proposed to use [***] of the Lease premises for industrial work that might involve use of "paint, lubricants, solvents, cleaning fluids, etc."  AR 403.

[20]     The October 2014 testing results - - taken one month following cancellation of the RFP showed TCE levels above the EPA limits with readings at 9.6 $\mu g/m^3$, 8.6 $\mu g/m^3$, 11 $\mu g/m^3$, and 9.0 $\mu g/m^3$.  DA 5-8.

putting in place a subsurface vapor extraction system, changing the air conditioning systems, performing quarterly air sampling for TCE, and drilling into the groundwater plume to add oil and bacteria to mitigate the formation of vapor.  AR 2704-07, 2716-17.

In sum, Contracting Officer Bixler reasonably exercised his judgment to cancel the RFP based on documented environmental concerns and potential health and safety risks.  Moreover, the Navy's cancellation decision was consistent with the RFP's terms which expressly reserved the Navy's "right to cancel this RFP, or to reject any and all submissions prepared in response hereto" and affirmed that the Agency has "no obligation to make an award."  AR 226; see Am. Gen. Leasing, 587 F.2d at 58-59 ("It is settled law that no assurance exists that [any] contractor will receive an award and that the Government retains, in its discretion, the right to reject all bids without liability.").

**Plaintiff Failed to Demonstrate that the Cancellation Decision was Fraudulent or a Pretext to Avoid Award to Open Spirit**

Open Spirit contends that the Navy's Memorandum to File that documents the Navy's cancellation decision is a "fraudulently created after-the-fact document" because it does not list a date while draft versions of this Memorandum were dated "September 2014." Pl.'s Mot. 17; AR 574-77.  Plaintiff argues that because the Memorandum to File was drafted between September 9, 2014, and October 6, 2014 - - after the decision to cancel the RFP - - it cannot reflect the Agency's contemporaneous thinking and must be fraudulent or a pretext for avoiding award to Open Spirit. See Def.'s Second Resp. to Pl.'s First Set of Interrogs. 2 (Sept. 4, 2015).

The Court finds no merit in Plaintiff's argument.  Contracting Officer Bixler's notes and emails contemporaneous with the cancellation decision, as well as the deposition testimony of Contracting Officer Bixler, Realty Specialist Arbesu, and Public Works Officer Commander Koster, corroborate the accuracy of the information contained in the Memorandum to File.  See AR 579, 590-93, 607-11, 616-23, 625, 633-38.  For example, Ms. Arbesu's notes from a September 9, 2014 meeting - - the day of the cancellation decision - - state:

> We were notified by [Environmental] Core on Monday, 8 Sep that EPA standards for vapor intrusion of TCEs have changed.  As there is documented existing vapor intrusion of TCEs within the area proposed [f]or lease, this has triggered conversations on the requirement for additional language/controls in the lease, and our ability to move forward with award.

> Received call from CDR Koster, [Naval Base Point Loma Public Works Officer], this morning regarding this concern and he provided the additional that SPAWAR had just been notified and have decided to move certain Navy personnel out of the building until further testing is completed.

AR 636.

Similarly, Contracting Officer Bixler's September 10, 2014 email contemporaneous with his cancellation decision corroborates the information related in the Memorandum to File:

- Changed requirements resulted from last minute information received from the Environmental Core team regarding recent changes in EPA guidelines which may impact the scope of the management required under the lease; possibly requiring additional language changes in the proposed new lease; ECP; and the RFP to restrict the use of specific chemicals on the lease premises. This new information was not known at the time we issued the RFP, nor prior to the receipt of bids.

- As the [Real Estate Contracting Officer], and after full consultation with Counsel; Env; and the Base [Public Works Officer], I made the decision as the RECO to cancel the RFP out of concerns and caution for human health, as well as consideration of having no opportunity to receive offeror resubmissions of bids in time prior to expiration of the RFP solicitation period.

AR 579.

The Navy explained in an interrogatory response why the Memorandum to File was not written immediately after the decision to cancel the RFP:

The "Memorandum to File" was written to memorialize various concomitant factors that David M. Bixler, the Real Estate Contracting Officer (RECO) considered, in consultation with real estate and environmental personnel, and legal counsel, in making his expedited decision to cancel the solicitation. As demonstrated by the AR, the Navy's transition from an expectation of issuing a final source selection decision to having to consider cancelling the solicitation began very shortly before the solicitation's expiration. As such, Mr. Bixler was not afforded time to generate a contemporaneous document . . . . Once the time-sensitive decision was made, however, Mr. Bixler, in conjunction with other real-estate and environmental personnel, and legal counsel, generated the Memorandum to File in an effort to provide a near-contemporaneous presentation of the various concomitant factors that he considered.

AR 2991-92.

The ample record evidence shows that the Memorandum to File accurately reflects Contracting Officer Bixler's thinking at the time of his decision to cancel the RFP. In sum, Plaintiff has failed to present clear and convincing evidence that the Memorandum to File was either "fraudulent" or "altered" or issued in bad faith in an attempt to injure Open Spirit. See Am-Pro, 281 F.3d at 1239-40.

In a related effort to impugn the cancellation decision, Plaintiff persists in arguing that Contracting Officer Bixler had already made an award determination prior to cancellation and that the Navy concocted the environmental concerns and canceled the Lease competition to avoid making award to Open Spirit. Pl.'s Mot. 14. The record does not support this assertion. Realty Specialist Arbesu was clear in her testimony that she had "anticipated" that an award decision would be made on September 8, 2014. AR 2341-43. Contracting Officer Bixler affirmed that no award decision had been made and that the technical evaluation board was required "to provide formal results of their findings" before the Navy could make an award. AR 2596; Compare AR

2256, 2267 with AR 2519-20.   The draft SSEB award recommendation was never finalized because of concerns about the risks of TCE vapor in the OT3 building.   Finally, as Plaintiff acknowledges, there was no executed Lease, as cancellation occurred before either party was given a proposed Lease for signature.

In sum, this Court's finding that Contracting Officer Bixler reasonably canceled the Solicitation is not undermined by Plaintiff's unsupported allegations that cancellation was a pretext for avoiding award to Open Spirit.

**Plaintiff Has Not Shown that the Navy Acted in Bad Faith**

Plaintiff argues that the Navy acted in bad faith by favoring the incumbent, Lockheed Martin, prior to and throughout the Lease competition.   Specifically, Plaintiff argues that the Navy acted in bad faith by refusing to disclose appraisal reports that Lockheed Martin had received, by conducting ex parte communications with Lockheed Martin before bids were due and by providing Lockheed Martin with favorable licenses prior to issuing the RFP.[21]   Plaintiff further asserts that the RFP's terms requiring that the lessee deposit a $750,000 performance bond and split sublessee rent payments with the Navy, imposed "inherently unfair" provisions on small businesses.   Pl.'s Mot. 28.   The Court addresses each of Plaintiff's arguments in turn.

**Appraisal Reports**

Plaintiff argues that the Navy "provided copies of the appraisals" of the Lease premises to Lockheed Martin and its predecessor which resulted in Lockheed having an unfair advantage in the instant Lease competition because it knew the amount of the current rent and previous appraisals.   Plaintiff relies on a declaration from William Bowersox, a former building/facility manager for Lockheed Martin, whom Plaintiff planned to hire if Open Spirit were awarded the Lease.   AR 400, 2988.   Mr. Bowersox, the former on-site representative for Lockheed Martin at the OT3 building, testified that in 2011:

> I witnessed the Appraisal agents evaluate the facility and was a party to the final Appraised value numbers as they were transmitted to me through the Lease renewal documents.
>
> I was informed by [Lockheed Martin] management and Navy personnel that it was a matter of law that the Lease cost must equal the fair market value as dictated by

---

[21]     In its opening motion, Plaintiff makes a passing assertion that the Navy acted in violation of 41 U.S.C. § 253b(a) by treating bidders unequally because the Lease at issue here was required to contain the same terms as prior leases and licenses held by Lockheed Martin.   Pl.'s Mot. 1, 28. However, the original Lockheed leases and licenses were made to obtain services related to the Air Force's Atlas/Centaur launch vehicle program and were for nearly 400,000 square feet of space.   AR 2765.   Plaintiff has failed to demonstrate that the Lease contemplated here was equivalent in purpose or scope to Lockheed Martin's prior lease agreements or licenses or that the Lease sub judice was required to have identical terms.

the most recent appraisal thus the numbers I witnessed on the 2011 Lease renewal paperwork were certified to be the official appraisal numbers . . . .

AR 57, 2989.

While Mr. Bowersox assumes that the rent Lockheed Martin paid the Navy must have equaled the fair market value, his testimony is speculative. The only basis for his assumption was lease renewal documents that reflected actual rental payments - - information any incumbent would possess. Mr. Bowersox's testimony does not establish that the Navy provided Lockheed Martin with access to the 2013 updated appraisal report, the report that determined the fair market value for the instant Lease. AR 2988-89.

The record as a whole demonstrates that the Navy did not provide Lockheed Martin with the 2013 updated appraisal report for the Lease premises. AR 564. Indeed, when Open Spirit submitted a question to the Navy, asking if Lockheed had "during any time of [its] occupancy, been provided access to any previous appraisals of the OT3 property described in [the] RFP," the Navy responded "No." Id. The Navy elaborated that it does not release appraisal reports but permitted potential offerors to conduct their own appraisals. AR 360, 564.

The record does not reflect whether Open Sprit engaged an appraiser. In any event, Open Spirit submitted a proposal that exceeded the appraised fair market value, and the Navy accepted Plaintiff's bid. Because Open Spirit's proposed pricing was competitively superior to Lockheed Martin's proposal in this highest-priced technically acceptable competition, Plaintiff was the recommended awardee and suffered no prejudice due to the Navy's alleged favoritism of Lockheed Martin. Compare AR 411 with AR 563; AR 2905.

### Alleged Ex Parte Communications

Plaintiff contends that the Navy had unlawful ex parte communications with Lockheed Martin that gave Lockheed a competitive advantage, citing an email dated prior to the RFP's issuance and telephone conversations immediately before bids were due. Pl.'s Mot. 29. At the outset, the Court notes that Plaintiff did not demonstrate that Lockheed Martin had a competitive advantage here. Plaintiff, not Lockheed Martin, was the SSEB's recommended awardee, and Lockheed Martin did not gain anything from the cancellation - - as the Navy has determined to use the premises itself and not conduct another Lease competition.

Nor do these alleged communications taint the Navy's cancellation decision. Plaintiff relies upon an email from Lockheed Martin to the Navy dated almost nine months before the RFP was issued. This August 27, 2013 email from Mr. Michael Costello, a Lockheed employee, to Realty Specialist Arbesu, stated that Lockheed Martin was "very interested in moving into a long term lease arrangement" and that Lockheed Martin wanted to have a meeting with the real estate

group to possibly "establish[] the time frame to begin working on the lease agreement, identification of any issues that may exist, and the path ahead."  AR 2839.[22]

The Navy denied Mr. Costello's request for a meeting.  Realty Specialist Arbesu told Mr. Costello that she could not discuss the Lease, as reflected in a September 12, 2013 email between Ms. Arbesu and Contracting Officer Bixler:

> Per our previous discussion, I have been contacted several times by a representative of Lockheed Martin Corporation, Mr. Michael Costello.  He has requested a meeting with Navy personnel to discuss the way ahead for a new lease for the space LMC occupies under license in a portion of Old Town Campus Building 3.  I confirmed with counsel and conveyed to Mr. Costello on 4 September 13 that it is inappropriate for Navy personnel to discuss the Lease with him, but if LM has any issues with the license, I could be of help.

DA 1.

Plaintiff further argues that Lockheed Martin improperly communicated with the Navy immediately before bids were submitted.  According to Ms. Arbesu's call log, she had three phone calls with Lockheed Martin - - at 6:38 a.m., 12:14 p.m., and 12:43 p.m. on June 12, 2014, the day bids were due, after Lockheed Martin submitted its initial bid on June 11, 2014, but before Lockheed Martin submitted its second bid on June 12, 2014.  AR 2898-99.  Plaintiff posits that Lockheed Martin had revised its "bid after the phone calls were made" and that Lockheed Martin's "original bid was believed to be non-conforming and would have clearly made Open Spirit the only responsive bidder and therefore the winning bidder."  Pl.'s Mot. 29; Pl.'s Resp. 19.  This allegation is not supported by the record.  In a May 27, 2015 declaration, Ms. Arbesu testified:

> Lockheed Martin Corporation ("LMC") submitted its proposal on June 11, 2014.  On or about June 12, 2014, a woman from LMC called me to tell me that a second proposal had been dropped off because they felt that the first proposal did not meet the RFP's specifications because it was not sealed and not put into two separate packages (package number 1 was supposed to be the technical proposal, and package number 2 was supposed to be the rent price proposal, i.e., "bid").  However, both "packages" were put into one binder (with one original and three copies actually submitted).  I asked if they had included a letter to tell me to disregard the first proposal.  The woman said, "No".  I told the woman that she would not be able to substitute one for the other unless written instruction to do so was provided.  Before 3pm that same day, a letter arrived instructing me to ignore the first proposal.

---

[22]   Mr. Costello worked in the OT3 building as a Technical Director at Lockheed Martin's Technology Collaboration Center, and his role in the subsequent Lease competition is unclear.  AR 2838.  The record reflects that Charlie Hardie was Lockheed Martin's real estate representative, and May Kemp was Lockheed Martin's Contract Administrator who signed its proposal.  AR 418, 2444, 2841.

Arbesu Decl. ¶ 6 (May 27, 2015).

The June 12, 2014 letter referenced in Ms. Arbesu's declaration is from May Kemp, Lockheed Martin's Contract Administrator, and stated:

> Lockheed Martin hereby withdraws referenced proposal [for RFP N6247314RP0007] which was submitted on 11 June 2014, with the exception of the contents of the white envelope labeled "Past Performance." The white envelope contains 2 sealed envelopes which contain Past Performance Surveys provided in support of Lockheed Martin.

AR 486.1. This letter corroborates Ms. Arbesu's May 27, 2015 declaration and deposition testimony and comports with the Solicitation terms that permit modification of proposals prior to the RFP closing date. Id.; AR 221. What Plaintiff claims was Lockheed Martin's proposal revision prompted by an improper ex parte communication was nothing more than a repackaging of the proposal that was permitted by the RFP. The RFP expressly provided that "[o]fferors may submit modifications to their proposals at any time before the RFP closing date and time" and that modifications could be submitted after the RFP closing time "to correct a mistake at any time before award." AR 221.

Plaintiff further argues that Lockheed Martin's bid should have been rejected outright as nonresponsive to the RFP because it contained modifications to the proposed lease. Plaintiff's argument is of no moment. AR 2905. The responsiveness vel non of Lockheed Martin's bid had no bearing on the challenged decision to cancel the RFP, and Lockheed Martin's continued participation in this competition did not prejudice Open Spirit because Open Spirit, not Lockheed Martin, was the recommended awardee.

Plaintiff has not come close to showing that the Navy's decision to cancel the Lease competition was influenced by ex parte communications with Lockheed Martin. Rather, the record establishes that the Navy canceled the RFP due to valid concerns about the environmental condition of the Lease premises that came to light in the days just before offers were set to expire. Because the Navy has reevaluated its needs and determined not to lease the OT3 space in the future, neither Plaintiff nor Lockheed Martin will have an opportunity to compete for this Lease award - - hardly a situation in which the Navy can be said to have favored Lockheed Martin. See Koster Decl. ¶¶ 3, 4 (Nov. 20, 2015).[23]

---

[23] Open Spirit also contends that the five-month overlap between the Lease start date of January 1, 2015, and Lockheed Martin's license end date of April 30, 2015, is evidence that the Navy only intended to make award to Lockheed Martin. Pl.'s Mot. 29. The record does not support any such "intention" as it is clear that the SSEB planned to recommend award to Open Spirit, not Lockheed Martin.

**Performance Bond and Subleasing Terms**

Lastly, Plaintiff argues that inclusion of the performance bond and rent-splitting subleasing terms in the RFP are "significant barriers to small companies while simultaneously being no obstacle at all for a larger company. . . ." Pl.'s Reply 13.

In <u>Blue & Gold Fleet</u>, the Federal Circuit held that a party that fails to "object to the terms of a government solicitation . . . prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims." 492 F.3d at 1313; <u>Bannum, Inc. v. United States</u>, 779 F.3d 1376, 1380-81 (Fed. Cir. 2015). By submitting its bid in compliance with the performance and security bond and rent splitting terms, Plaintiff accepted these Lease terms and waived its right to challenge these terms. AR 393; <u>Blue & Gold</u>, 492 F.3d at 1313-14 (holding that protestors "cannot sit on their rights to challenge what they believe is an unfair solicitation, roll the dice and see if they receive award and then, if unsuccessful, claim the solicitation was infirm" (quoting <u>Argencord Mach. & Equip., Inc. v. United States</u>, 68 Fed. Cl. 167, 175 n.14 (2005))).

**Conclusion**

Plaintiff's motion to supplement the AR is **GRANTED** in part, and Defendant's motion to supplement the AR is **GRANTED**. The Court supplements the AR with AR 574-77, 2732-41, 2872-78, 2882-2899, 2900-11, 2920-23, 2990-93, 2941-86, 2987, 2988-89 and DA 1-8.

Defendant's cross-motion for judgment on the AR is **GRANTED**.

Plaintiff's motion for judgment on the AR is **DENIED**. Plaintiff's request for bid and proposal costs is **DENIED**.

s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**